1  FAYER GIPSON LLP
   GREGORY A. FAYER (State Bar No. 232303)
2  GFayer@fayergipson.com
   MICHELLE K. MILLARD (State Bar No. 298245)
3  MMillard@fayergipson.com
   STEVEN G. EDWARDS (State Bar No. 304165)
4  SEdwards@fayergipson.com
   2029 Century Park East, Suite 3535
5  Los Angeles, California 90067
   Telephone: 310.557.3558
6  Facsimile:  310.557.3589

7  Attorneys for Plaintiffs Hillair Capital Management
   LLC; Hillair Capital Investments LP

8

A6009
91369

FILED
Superior Court of California
County of Los Angeles

MAR 21 2016

Sherri R. Carter, Executive Officer/Clerk
By _____ Cristina Grijalva _____ Deputy
Cristina Grijalva

ORIGINAL

9

10            DIS Richard Fruin

11        SUPERIOR COURT OF THE STATE OF CALIFORNIA

12        FOR THE COUNTY OF LOS ANGELES, WESTERN DISTRICT

13

14

15  HILLAIR CAPITAL MANAGEMENT LLC, a        Case No.  **BC 6 1 4 3 7 4**
    Delaware Limited Liability Company; HILLAIR
16  CAPITAL INVESTMENTS LP, a Cayman Islands
    Limited Partnership,
17
                         Plaintiff,            **COMPLAINT FOR:**
18
           v.
19                                            **(1) BREACH OF CONTRACT**
    KIM KARDASHIAN, an individual; KHLOE     **(2) BREACH OF COVENANT OF GOOD**
20  KARDASHIAN, an individual; KOURTNEY          **FAITH AND FAIR DEALING**
    KARDASHIAN, an individual; KIMSAPRINCESS  **(3) BREACH OF FIDUCIARY DUTY**
21  INC., a California corporation, 2DIE4KOURT, a  **(4) FRAUD/DECEIT**
    California corporation, KHLOMONEY INC., a  **(5) NEGLIGENT MISREPRESENTATION**
22  California corporation, and DOES 1-100, inclusive,  **(6) PROMISSORY ESTOPPEL**
23
                         Defendants.
24                                            **DEMAND FOR JURY TRIAL**
25

26

27

28

CIT/CASE: BC614374
LEA/DEF#:
RECEIPT #: CCH195707074
DATE PAID: 03/21/16   03:35 PM
PAYMENT: $435.00
RECEIVED:
CHECK:                  310
CASH:
CHANGE:
CARD:
                    $435.00
                    $0.00
                    $0.00
                    $0.00

03/21/2016

FAYER GIPSON LLP

---
                        COMPLAINT

Plaintiffs Hillair Capital Management LLC ("HCM") and Hillair Capital Investments LP ("HCI") (collectively, "Hillair" or "Plaintiffs") hereby allege, on information and belief, as follows:

## NATURE OF THE ACTION

1.     This is an action for breach of contract, breach of the covenant of good faith and fair dealing, and for fraud and related claims against defendants Kim Kardashian ("Kim"), Khloe Kardashian ("Khloe"), Kourtney Kardashian ("Kourtney") (collectively, the "Kardashians"), and their respective personal services loan-out companies, Kimsaprincess Inc., Khlomoney Inc. and 2Die4Kourt (collectively with the Kardashians, the "Defendants").

2.     At the core of this dispute is a term sheet agreement entered into between Hillair and the Kardashians in July 2014, whereby Hillair agreed to put up millions of dollars to help the Kardashians salvage their struggling "Kardashian Beauty" makeup line after former distributor, Boldface, went belly up amidst legal and financial troubles.  The essence of the parties' bargain was that Hillair would put up millions of dollars to fund the continued distribution of the Kardashians' line, and the Kardashians would continue to be the faces of the line and actively promote, market and support the line, while making certain concessions under their existing deal with Boldface.

3.     The mechanism by which this was to be accomplished under the term sheet was the formation of a new company, jointly owned by Hillair and the Kardashians, to continue distribution of the Kardashian-branded cosmetics line after Hillair acquired Boldface's assets out of insolvency. In this way both Hillair and the Kardashians were to have a significant stake in the new company and, consequently, the success of the Kardashian Beauty line.  The Kardashians' support was, of course, absolutely essential to the success of the Kardashian-branded line and was a fundamental premise of the parties' bargain.

4.     But while Hillair upheld its end of the bargain, the Kardashians did not.  After the parties executed the term sheet and Hillair's money was committed, the Kardashians almost immediately stopped marketing, promoting and supporting the line and began courting new potential investors to buy out Hillair's stake.  In short: the Kardashians wanted a better, more lucrative deal than they had struck with Hillair after the money to continue the line was already committed, and they used their ability to withhold their support of the line to attempt to force Hillair into a buyout of its interest.

5.      The Kardashians' attempts to find a new partner to distribute the makeup line and leverage a buyout of Hillair's interest dragged on for well over a year.  During this time, Hillair reluctantly agreed to enter into term sheet agreements with at least two of the Kardashians' preferred financing partners whose deals would have paid the Kardashians up to $10 million in up-front money. It became clear at length, however, that these other offers were pie in the sky and that none of the Kardashians' preferred partners had sufficient funds to complete the deals.

6.      After these deals fell through, rather than belatedly performing their duties to promote, market and support the Kardashian Beauty line, the Kardashians began making threats to terminate the license authorizing the use of their names in connection with the Kardashian Beauty line – an act that would sound the death knell of the company in which Hillair had invested millions of dollars to promote the Kardashian Beauty line in reliance on the Kardashians' good faith and promises to continue to promote and support the line.

7.      The Kardashians' wrongful conduct has destroyed any opportunity for Hillair to obtain the benefit of its bargain under the term sheet.  Hillair, having bailed out the Kardashian Beauty line from insolvency, has expended over $10 million in reliance on the Kardashians' good faith and their promises to continue to actively market and support the Kardashian Beauty line.  After acting in good faith for over a year and a half to support and finance the venture with the Kardashians while the Kardashians did nothing but undermine it, Hillair was finally left with no choice but to bring this action.

8.      As a result of the Kardashians' conduct alleged herein, Hillair has suffered significant damages, including the loss of approximately $10,170,000 in invested funds, as well as the loss of the value of Hillair's equity interest in the company that distributes the Kardashian Beauty line, valued at between $64,000,000 and $180,000,000.

## PARTIES

9.      Plaintiff Hillair Capital Management LLC is a limited liability company organized and existing under the laws of the State of Delaware, with its principal offices in Burlingame, California. HCM is in the business of managing investment funds – specifically, the Hillair Capital Investments family of funds.  HCM is the investment advisor to HCI.

10. Plaintiff Hillair Capital Investments LP is an exempt limited partnership organized and existing under the laws of the Cayman Islands. HCI invests funds in small-cap publicly traded U.S. and Canadian companies and in other opportunities.

11. Defendant Kim Kardashian is a natural person who, on information and belief, is and was at all times relevant to the action a resident of the County of Los Angeles. Kim is a celebrity and reality television star. Defendant Kimsaprincess Inc. is wholly owned, controlled and dominated by Kim Kardashian.

12. Defendant Khloe Kardashian is a natural person who, on information and belief, is and was at all times relevant to the action a resident of the County of Los Angeles. Khloe is a celebrity and reality television star. Defendant Khlomoney Inc. is wholly owned, controlled and dominated by Khloe Kardashian.

13. Defendant Kourtney Kardashian is a natural person who, on information and belief, is and was at all times relevant to the action a resident of the County of Los Angeles. Kourtney is a celebrity and reality television star. Defendant 2Die4Kourt is wholly owned, controlled and dominated by Kourtney Kardashian.

14. Defendant Kimsaprincess Inc. is a California corporation located at 21731 Ventura Blvd. #300, Los Angeles, CA 91364. Kimsaprincess Inc. is a personal services loan-out corporation that is wholly owned, controlled, and dominated by defendant Kim Kardashian for the benefit of Kim Kardashian. At all times described herein there is and was a unity of interest and ownership between Kim Kardashian and Kimsaprincess Inc. At all times described herein Kim Kardashian and her namesake company were alter egos of each other and Kimsaprincess Inc. acted as Kim Kardashian's agent.

15. Defendant Khlomoney Inc. is a California corporation located at 21731 Ventura Blvd. #300, Los Angeles, CA 91364. Khlomoney Inc. is a personal services loan-out corporation that is wholly owned, controlled and dominated by Khloe Kardashian for the benefit of Khloe Kardashian. At all times described herein there is and was a unity of interest and ownership between Khloe Kardashian and Khlomoney Inc. At all times described herein Khloe Kardashian and her namesake company were alter egos of each other and Khlomoney Inc. acted as Khloe Kardashian's agent.

16.     Defendant 2Die4Kourt is a California corporation located at 21731 Ventura Blvd. #300, Los Angeles, CA 91364.  2Die4Kourt is a personal services loan-out corporation that is wholly owned, controlled, and dominated by Kourtney Kardashian for the benefit of Kourtney Kardashian. At all times described herein there is and was a unity of interest and ownership between Kourtney Kardashian and 2Die4Kourt.  At all times herein, Kourtney Kardashian and her namesake company were alter egos of each other and 2Die4Kourt acted as Kourtney Kardashian's agent.

17.     The true names and capacities, whether individual, corporate, associate or otherwise, of Defendants sued herein as DOES 1-100, inclusive, are unknown at the present time and Plaintiff therefore sue said DOES and each of them by such fictitious names.  If necessary, Plaintiff will seek leave of the Court to amend this Complaint to allege their true names and capacities when they are ascertained.

18.     Unless otherwise indicated herein, on information and belief, each of DOES 1-100, inclusive, participated in the activities described herein and rendered material assistance to the other Defendants in the actions alleged herein, conspired and agreed with and aided and abetted one or more of the other Defendants and at all relevant times each of the Defendants was the principal or agent, partner, joint venturer, co-venturer, co-conspirator, independent contractor, servant and/or employee of at least one other of the other Defendants and all of the acts performed by them or omissions alleged herein were made in the course and scope of their employment, agency, partnership or other such relationship and with knowledge, consent, approval and/or ratification of the principals and each of them.  Unless otherwise indicated herein, each of the parties herein named as DOES 1-100 is responsible in some manner or fashion, and is by contract or otherwise, the successor, assign, joint venturer, co-venturer, co-conspirator, partner or alter ego of one or more of the Defendants, or was otherwise involved with the other Defendants in the wrongdoing alleged herein, and by virtue of such capacity, assumed the obligations herein owed by Defendants, and is liable and responsible for the damages on the facts alleged herein and for all the relief sought.

//

//

//

4
COMPLAINT

## GENERAL ALLEGATIONS

### Hillair

19.     HCM is an investment management firm that manages the investment of funds by HCI. HCI is an investment fund that specializes in investing in small-cap publicly traded U.S. and Canadian companies in need of catalytic growth capital.  Founded in 2012, HCI has won numerous industry awards since inception and was most recently named Emerging Credit Fund of the Year at the 2015 Investors Choice Awards.

20.     As explained below, HCI is the principle investor in the current distributor of the Kardashian Beauty line, Haven Beauty, Inc. ("Haven").  HCI was also, at the time of the Boldface insolvency, the principal investor in the prior distributor of the line, having pumped millions of dollars into Boldface as necessary to salvage the line from insolvency.  HCM has at all times been responsible for managing and overseeing those investments.

### Boldface and the Kardashian Khroma Makeup Line

21.     Boldface was a cosmetics licensing and branding company formed in or about April 2012 shortly after the principals of Boldface struck a deal with the Kardashians providing for the joint creation, marketing and distribution of a new Kardashian-sponsored cosmetics line.  The deal was memorialized in a licensing agreement dated as of May 9, 2012 between the Kardashians, via their loan out companies, and Boldface (the "License").

22.     The Kardashians and Boldface worked together extensively to create the new Kardashian-branded line.  The Kardashians had significant involvement in all aspects of the line, from product design and development, to quality control, to naming, branding and marketing, as well as other aspects of the development and sale of the line.  The Kardashians were to market, promote and support all aspects of the line, while Boldface would market, sell and distribute the line.  The goal was to design, market and sell a makeup line that had individualized makeup products with a strong personal connection to the Kardashians in order to tap into the Kardashians' tens of millions of fans and social media followers.

23.     The makeup line was launched in or about December 2012 under the name "Khroma Beauty" – a name that the Kardashians chose and approved, as documented on an episode of their

5

COMPLAINT

television show, *Keeping Up with the Kardashians*.  Press releases touted the Kardashians as "co-creators" of the line and "partners" in the makeup venture with Boldface.  A June 6, 2012 press release announcing the Khroma line describes the Kardashians as the "creators, ambassadors and faces for Khroma Beauty."  The Kardashians promoted and marketed the makeup line to the public as their own, including to tens of millions of their fans on their blogs and their social media.  The Kardashians had complete involvement in every aspect of the makeup line – from naming and packaging, to colors and textures, to the products themselves.

24.     On March 11, 2013, however, the United States District Court for the Central District of California entered a preliminary injunction, enjoining Boldface from marketing and distributing the Kardashian makeup line under the name "Khroma."  *See Boldface Licensing + Branding v. By Lee Tillett, Inc.*, 940 F. Supp. 2d 1178 (C.D. Cal. 2013) (order granting preliminary injunction).  The court's ruling was based on a finding that the distribution of the Kardashian-branded line under the "Khroma" mark was likely to infringe the trademark rights of counterclaimant By Lee Tillett, Inc. ("Tillett") in Tillett's prior registered mark "Kroma" for cosmetics products. *Id.* at 1196.

25.     On August 14, 2013, the district court entered a permanent injunction, enjoining any further use of the name "Khroma" in connection with the Kardashians' makeup line.  On June 5, 2014, the Tillett litigation was dismissed pursuant to a settlement, however the permanent injunction remained in place.

26.     As a result of the injunction, in early May 2013 Boldface and the Kardashians decided to change the name of the line from "Khroma Beauty" to "Kardashian Beauty."  The name change was announced in a press release on May 9, 2013.  The press release, which Plaintiffs are informed and believe was vetted and approved by the Kardashians, touted that "*Kourtney, Kim and Khloe are the inspiration and driving force behind every aspect of the [Kardashian Beauty line]*" (emphasis added).

27.     From May 2013 through the present, the Kardashians' makeup line has been marketed and distributed under the name "Kardashian Beauty."  The Kardashians own the rights to this name.  On May 6, 2013, the Kardashians, via their loan out companies, filed an application to register the "Kardashian Beauty" mark for cosmetics with United States Patent and Trademark Office ("PTO").

FAYER GIPSON LLP

6

1    The registration (no. 4909148) issued on March 1, 2016.  The Kardashians currently have six (6) other

2    pending PTO registrations incorporating the name "Kardashian Beauty."

3                                   Hillair's Investment in Boldface

4         28.     Due to the legal difficulties surrounding the Kardashian "Khroma" line and other

5    business setbacks, Boldface began experiencing financial difficulties.  By spring of 2013, after the

6    injunction against use of the Khroma name, it became clear that Boldface could not continue doing

7    business and market and distribute the line without a significant infusion of additional capital.

8    Accordingly, Boldface began looking for potential investors to fund the company.

9         29.     In June 2013, after lengthy negotiations, Hillair agreed to invest $1,000,000 in Boldface

10   in the form of secured convertible debt.

11        30.     Hillair subsequently made an additional $550,000 investment in Boldface in the form

12   of secured convertible debt in August of 2013 to fund working capital and growth.

13        31.     In March 2014, Hillair worked to restructure the company's finances, including

14   converting almost all of Hillair's 2013 debt into preferred equity and providing an additional

15   $1,000,000 in secured convertible debt financing.

16        32.     When Boldface's financial situation continued to deteriorate, Hillair looked at

17   additional restructuring options and continued to fund the company, including providing an additional

18   $1,649,000 in secured debt financing in July and August 2014.

19        33.     Ultimately, however, Boldface, in conjunction with the Kardashians and Hillair,

20   determined that an insolvency action was necessary to successfully salvage the makeup line, despite

21   the fact that Hillair's preferred stock position would be wiped out in the process.  On or about

22   September 3, 2014, an insolvency action was filed and a court-appointed receiver for Boldface was

23   appointed.

24        34.     Prior to the insolvency, in or about July 2014, negotiations ensued between the

25   Kardashians and Hillair to enter into a new arrangement to salvage the Kardashian Beauty line and

26   preserve value in light of the impending Boldface insolvency.

27   //

28   //

FAYER GIPSON LLP

### The Binding Term Sheet

35.     In or about July 31, 2014, the parties entered into a binding term sheet agreement by and between Hillair and the Kardashians, via their personal services loan-out companies (the "Term Sheet"). *See* **Exhibit A** hereto (partially redacted for confidentiality reasons). The Term Sheet sets forth the basic parameters for Hillair and the Kardashians to move forward together with marketing and sale of the Kardashian Beauty line in light of the Boldface insolvency, provided that Hillair (via a yet-to-be-formed entity) successfully obtained the Boldface assets at auction in the Boldface receivership. The Term Sheet expressly states that it "is intended to be binding on the parties hereto and each party hereto may rely on the undertakings set forth herein."

36.     The mechanism for this venture, under the Term Sheet, was the formation of a new entity – which the Term Sheet refers to as "Newco" or the "Issuer" – in which the Kardashians and Hillair would be joint owners. The Term Sheet sets forth the respective ownership percentages for Hillair and the Kardashians in Newco, as well as various other preliminary terms of the parties' venture to salvage the Kardashian Beauty line.

37.     The Kardashians' commitment to market, promote and support the development of the line, as they had been doing for the two (2) prior years with Boldface as the distributor, was a fundamental premise of Hillair's agreement to enter into the Term Sheet. The Kardashians, through their representatives, clearly and unequivocally represented to Hillair, prior to entering into the Term Sheet, that the Kardashians would continue to fully market, promote and support their makeup line, as they had up to that time. Without this commitment, Hillair would not have entered into the Term Sheet, as it would be virtually impossible to exploit the Kardashian-branded makeup line without the Kardashians' full support, cooperation and approval. Moreover, without the Kardashians' full support, cooperation and approval, the assets of Boldface that Hillair acquired pursuant to the Term Sheet would have been virtually worthless. Notably, the Term Sheet contains no integration clause. Accordingly, the Kardashians' commitment to continue to market, promote and support the line was incorporated into the parties' agreement under the Term Sheet.

38.     The Term Sheet contains only one express condition precedent: namely, that the Issuer (*viz.*, Newco) must become "the purchaser of substantially all the assets of [Boldface]."  As explained below, this condition was satisfied.

39.     Pursuant to the Term Sheet, Hillair formed Newco on October 1, 2014 as a Delaware corporation, under the name Newco Beauty Company, Inc. ("Newco").  As explained below, the name of the company was subsequently changed to Haven Beauty, Inc., and Hillair's interest in the company was subsequently transferred to a holding company.

40.     The auction of substantially all of Boldface assets by the court-appointed receiver was held on October 17, 2014.  Hillair was the winning bidder, and the only qualified bidder for the Boldface assets.

41.     On or about October 22, 2014, substantially all of Boldface's assets were transferred to Newco by the court-appointed receiver pursuant a Bill of Sale and an Instrument of Transfer and Assignment, each dated October 22, 2014.  Attached hereto as **Exhibits B & C**.  The Kardashians consented to this transfer in writing in entering into the Term Sheet, and did not object to the transaction at auction.

42.     On or about October 27, 2014, Newco's name was changed to Haven Beauty, Inc. From its inception through the present time, the entirety of Haven's business is and has been the worldwide distribution of the Kardashian Beauty makeup line.

<u>Hillair's Funding of Haven in Reliance on the Kardashians' Good Faith</u>

43.     The Term Sheet contemplated that the parties would work together in good faith to consummate the acts called for under the Term Sheet.  Principle among those was setting up a mechanism – namely, Haven – in which Hillair and the Kardashians would both have a significant stake and through which they would work together to profit from the sale of the Kardashian Beauty makeup line. Hillair would fund the company and the Kardashians would market, promote and support their makeup line, as they had been doing for approximately two (2) years with Boldface as distributor of the line.

44.     Having transferred substantially all of Boldface's assets to Haven, as called for by the Term Sheet, Hillair went on to inject millions of dollars in capital to fund Haven's distribution of the

9

COMPLAINT

Kardashian Beauty line. In addition to the $3.2 million expressly required to be invested in Newco/Haven under the Term Sheet, Hillair has acted in good faith to fund the business operations of Haven as necessary to market and sell the Kardashian Beauty line.

45.     Hillair's total capital funding of Haven to date, including cash invested and assets contributed, is $10,170,000, representing approximately $4,900,000 in capital funding (cash invested) in addition to the minimum amounts required by the Term Sheet. Without this capital, Haven would have been unable to carry on its business and continue to develop, produce and distribute the Kardashian Beauty line. Hillair's additional funding of Haven was necessary for the parties to effectuate the benefit of their bargain under the Term Sheet, and it was also requested by the Kardashians. Indeed, the Kardashians, through their agents and attorneys, have repeatedly requested that Hillair inject even more capital into Haven to fund the distribution of the Kardashian Beauty line than Hillair has put in to date.

<u>Hillair's Attempt to Transfer the Kardashians' Equity in Haven</u>

46.     The Term Sheet contemplates that the Kardashians "will receive 40% of the fully diluted equity" in Haven. Accordingly, shortly after Boldface's assets were transferred to Haven, Hillair began attempting and offering to transfer the Kardashians' equity stake in Haven to them.

47.     The Kardashians' family attorney, Todd Wilson, however, informed Hillair that the Kardashians did not want the Haven equity transferred to them at that time due to negative tax consequences that they had not previously considered.

48.     On or about December 10, 2014, Mr. Wilson suggested that Haven should be converted to a limited liability company before the Kardashians took their equity interest, and provided a draft LLC operating agreement to Hillair for review. Hillair agreed, but the Kardashians failed to take the necessary steps for the conversion and transfer of interest to occur after they were approached by a South African investment group about a potential buyout of Hillair's interest whereby the Kardashians would have received a $10 million up-front payment.

49.     To date, the Kardashians have refused all offers by Hillair to transfer the Kardashians' equity interest in Haven to them, as contemplated under the Term Sheet.

10
COMPLAINT

FAYER GIPSON LLP

### The Kardashians' Failure to Market and Promote the Line

50.     While Hillair fully performed and/or stood ready to perform all of its material obligations under the Term Sheet, the Kardashians did not.  To the contrary, after the Term Sheet was signed and Hillair's funds were committed, the Kardashians began taking steps to undermine Hillair's ability to receive the benefit of its bargain under the Term Sheet and to prevent the acts contemplated by the Term Sheet from occurring.

51.     After the execution of the Term Sheet, virtually all marketing and promotion of the Kardashian Beauty line by the Kardashians ceased.  This was so despite the two-year prior history of the Kardashians' total involvement in every aspect of the line, and the Kardashians' previous extensive efforts to promote the line on their blogs and social media throughout the time that the line was distributed by Boldface.  This was so notwithstanding repeated requests by Hillair for the Kardashians to perform these duties and notwithstanding the fact that all parties understood that the Kardashians full support and cooperation was essential to the success of the Kardashian-branded "Kardashian Beauty" line.

52.     Not only did the Kardashians fail to take the steps necessary to market, promote and support the line, the Kardashians took affirmative steps to delay or undermine the ability of Haven to effectively distribute the Kardashian Beauty line.

53.     As one example, the distribution of the Kardashian Beauty line through ecommerce is essential to the successful distribution of the line.  This is particularly so in light of the fact that the Kardashians collectively have well over 100 million social media followers on Twitter, Instagram, Facebook and other sites.  All parties were aware of these facts.  Nevertheless, after Haven diligently constructed the ecommerce site for the Kardashian Beauty line, its launch was delayed for months at the Kardashians' request, based largely on the Kardashians' desire (discussed below) to obtain another financier to buy out Hillair's interest in Haven that would give them an even more lucrative deal.  Even after the Kardashians' approval was finally obtained and the ecommerce site was launched, the Kardashians' attorneys began threatening to cancel the License (without which the Kardashian Beauty line could not be distributed) based on assertions that certain wholly unidentified images of the Kardashians on the site (which they had approved) had not been approved by the Kardashians.

54.     In addition, despite failing to adequately promote the Kardashian Beauty line, the Kardashians have nonetheless repeatedly promoted other cosmetics brands and products on their social media.

55.     Indeed, in mid-March 2016, it was announced that Kim Kardashian was lending her name to a lipstick shade called "Kim KW" for a celebrity-endorsed line by makeup artist Charlotte Tilbury. According to reports, the line "pay homage to 12 of [Tilbury's] favorite celebrities." Photos of the lipstick and packaging displaying the name confirm that the lipstick takes the essence of the nude lip look that Kim Kardashian made famous and markets the Tilbury product under her name, "Kim KW."

56.     In addition, at an appearance at the "Beauty World" exhibition in Dubai in May 2015, Khloe Kardashian publicly disparaged the Kardashian Beauty line and Haven. Ms. Kardashian was scheduled to attend the exhibition to promote the Kardashian Beauty line along with two of Haven's international distributors of the line, ANDA and Bee Beautiful. However, when Khloe showed up at the expo on May 26 and met the ANDA representatives who were to take her to the Bee Beautiful booth for an appearance, Ms. Kardashian began screaming and cursing, stating publicly that Haven was selling the Kardashian Beauty products illegally and that she hated everything about the Kardashian Beauty products and appearance. Ms. Kardashians' appearance was therefore cancelled.

57.     Also, in June 2015, after Haven repaired relations with CVS, a former distributor of the Kardashian Beauty, CVS agreed to reintroduce the Kardashian Beauty line into its stores provided only that the Kardashians provide a letter stating that they continued to support the Kardashian Beauty line. To date, despite repeated requests the Kardashians have failed to provide a letter of support for the line and the line has not been reintroduced into CVS.

### The Kardashians' Attempts to Circumvent Hillair

58.     After the Term Sheet was executed and Hillair's funds were committed, Hillair made repeated requests for the Kardashians to market and promote the Kardashian Beauty line. But while the Kardashians acknowledged they had an obligation to do so, the Kardashians' representatives continually stated that they did not want to actively market and promote the line because they were in talks with other investment groups to buy out Hillair's equity interest in Haven. Under such deals,

FAYER GIPSON LLP

1 │ had they materialized, the Kardashians would have obtained even more lucrative financial terms and

2 │ far greater up-front payments for distribution of the line.  In short: the Kardashians wanted a better

3 │ deal than they had struck with Hillair.  Towards this end, they failed and refused to properly market

4 │ and promote the line in the hope that a more lucrative financial deal would materialize.  It never did.

5 │      59.     From shortly after the Term Sheet was signed through the fall of 2015, the Kardashians

6 │ claimed to be in talks with other potential investors.  Even after those attempts fell through, instead of

7 │ belatedly resuming their marketing and promotional duties, the Kardashians instead, through their

8 │ attorneys, began making threats to cancel the License – an act which would kill the ability of Haven

9 │ to distribute the Kardashian Beauty line and would destroy any opportunity for Hillair to obtain the

10 │ benefit of its bargain under the Term Sheet.

11 │      60.     Shortly after the Term Sheet was signed, the Kardashians, through their attorney, Todd

12 │ Wilson, began courting other potential investors/purchasers of the Boldface assets in order to attempt

13 │ to leverage a more lucrative deal than the Kardashians had struck in the Term Sheet.  To facilitate this,

14 │ the Kardashians began working with the CEO of Boldface, John LaBonty, to attempt to knock down

15 │ the amount of Hillair's secured debt in Boldface to encourage other bidders.  Due to Mr. Wilson's

16 │ threat to terminate the License absent a reduction, Hillair ultimately agreed to reduce the amount of

17 │ its secured debt credit bid for Boldface's assets by $700,000.

18 │      61.     In or about late summer/early fall 2014, Mr. Wilson, on behalf of the Kardashians,

19 │ entered into negotiations with at least two investment groups: Regnery, based in Dubai, United Arab

20 │ Emirates, and Azulade, based in South Africa.  Hillair is informed and believes that subsequent to

21 │ entering into the Term Sheet with Hillair, the Kardashians also entered into term sheet agreements

22 │ with Regnery and Azulade that would have paid the Kardashians up to $10 million in up-front

23 │ payments had one of these groups acquired the Boldface assets at auction.  The Kardashians then took

24 │ steps to attempt to ensure that one of these groups, not Hillair, would be the winning bidder at the

25 │ Boldface auction.

26 │      62.     The Boldface auction was originally set for October 15, 2014.  At the auction, however,

27 │ the Kardashians' attorney, Mr. Wilson, publicly threatened to terminate the License if the auction was

28 │ not postponed after Regnery and Azulade both failed to qualify by failing to provide required deposits

FAYER GIPSON LLP

FAYER GIPSON LLP

1   and financial documentation.  Because of this, the auction was postponed until October 17, 2014 to

2   give Regnery and Azulade more time to meet the qualifications.

3        63.    On October 17, 2014, Hillair remained the only qualified bidder and acquired the

4   Boldface assets.  After this, Hillair had discussions with the Kardashians regarding consummating the

5   transactions required by the Term Sheet.  The Kardashians, however, slow-rolled these discussions

6   based on the fact that the Kardashians were still actively shopping for other partners to buy out Hillair

7   on terms more favorable to the Kardashians.

8        64.    Because the Kardashians' full support was essential to the ability to market and

9   distribute the Kardashian-branded makeup line, Hillair had no practical alternative other than to allow

10  the Kardashians to look for other partners.  Nevertheless throughout this time Hillair continued to

11  perform its duties and inject millions of dollars of capital into Haven and proceed with efforts to

12  distribute the Kardashian Beauty line, as contemplated by the Term Sheet.  These efforts, however,

13  were severely hampered by the fact that the Kardashians were no longer actively promoting and

14  marketing their own line.

15       65.    Shortly after the Boldface asset purchase, Hillair, at the Kardashians' insistence,

16  entered into negotiations with the Dubai group, Regnery, to purchase Hillair's interest in Haven.

17  Because the Kardashians were a necessary partner and they wanted to pursue a deal with Regnery,

18  Hillair reluctantly agreed to enter into a term sheet agreement with Regnery to purchase the assets of

19  Haven and terminate Hillair's Term Sheet with the Kardashians for approximately $6.5 million.  The

20  deal, however, fell through because it became clear that Regnery did not have the funds to complete

21  the transactions.

22       66.    Throughout the first part of 2015, the Kardashians pursued negotiations with numerous

23  potential investment partners to attempt to buy out Hillair's interest and provide the Kardashians with

24  a more lucrative deal.  None of these deals materialized.

25       67.    Throughout the spring and summer of 2015, the Kardashians were again in active

26  negotiations with the South African group, Azulade.  The parties entered into a binding term sheet

27  regarding the transaction in or about April 2015.  These included a term sheet between Hillair and

28  Azulade whereby Hillair's equity interest in Haven would be purchased for $9 million, plus any

14

COMPLAINT

1   additional funds invested in Haven after that time. The Kardashians would have been paid

2   approximately $10 million in up-front money by Azulade. Again, in light of the fact that the

3   Kardashians full cooperation was necessary for Haven to market and distribute the Kardashian Beauty

4   line, Hillair reluctantly agreed to this deal.

5       68.     Meanwhile, during the summer of 2015, the Kardashians had a falling out with their

6   hand-picked CEO, John LaBonty, formerly of Boldface, who subsequently became the CEO of Haven

7   at the Kardashians' insistence after the transfer of the Boldface assets to Haven. Nevertheless, in

8   September 2015, Mr. LaBonty was terminated as CEO of Haven solely due to the Kardashians'

9   insistence. The Kardashians' attorney, Mr. Wilson, provided written comments on Mr. LaBonty's

10   proposed severance agreement.

11       69.     Over the course of summer and fall 2015, it became apparent that Azulade did not have

12   the funds necessary to complete the transaction. Accordingly, the Azulade deal, like the Regnery deal,

13   ultimately fell through and was abandoned. At that point, there were no further discussions of a buyout

14   of Hillair's interest.

15                    Hillair's "Plan B" Proposal and The Kardashians Non-Performance

16       70.     Anticipating the collapse of the Azulade deal, in or about August 2015, Hillair again

17   requested that the parties move forward with consummating the transactions called for under the Term

18   Sheet, which the Kardashians had failed and refused to consummate pending resolution of the potential

19   buyout issues. The Kardashians, however, were reluctant.

20       71.     Accordingly, in a show of good faith, on August 17, 2015 Hillair sent the Kardashians

21   a "Plan B" proposal for moving forward. The Plan B proposal, *inter alia*, would have given the

22   Kardashians a better equity split than they had previously agreed to under the Term Sheet, would have

23   extended the License term to provide further time for Haven to build up successful worldwide

24   distribution of the line, and would have also given the Kardashians a six-month option to purchase

25   Hillair's stake in Haven if they were to find another equity partner that they preferred. A December

26   follow-up to the proposal touted the substantial achievements of Haven to date – even without

27   Kardashian support – including, mending old relationships damaged by the Boldface insolvency,

28   opening up major new distribution avenues (including Walmart, Walgreen's, Target, Macy's and

15

others), and setting the stage for a substantial online retail business. Based on this progress and predicated on an assumption of "[f]ull support of the Kardashians," projected revenues under Plan B would have exceeded would have exceeded $250 million by the end of 2017. This would have resulted in royalties of over $27 million to the Kardashians, as well as a terminal equity value to the Kardashians (based on their 40% equity in Haven, per the Term Sheet) of over $43 million using a discounted cash flow analysis and, alternatively, almost $150 million based on recent acquisitions of comparable beauty lines. This, despite the fact that it is very difficult to obtain distributors for a makeup line when the licensor of the rights for the line is not performing or even taking minimal steps to support the line.

72.     Throughout the fall, several meetings with the Kardashians' representatives were scheduled and then delayed by the Kardashians' representatives. After a December 2015 call with the Kardashians' manager, Kris Jenner, the Kardashians requested further information about the proposal, including detailed financial projections. Hillair subsequently provided all of the requested information.

73.     However, on January 15, 2016, after Hillair provided the Kardashians' attorney, Mr. Wilson, with draft documents for moving forward with the Plan B transaction, Mr. Wilson informed Hillair that the Kardashians did not wish to move forward. Despite the fact that Hillair had already put almost $6 million in cash and over $4 million in contributed assets acquired from Boldface into Haven, and were willing to commit far more, Mr. Wilson claimed that the Kardashians believed that the company would be undercapitalized. The Kardashians, however, made no counterproposal, did not suggest how much additional funding the Kardashians believed the company would need, and did not suggest the terms on which the Kardashians would agree to move forward.

74.     After that time, Hillair attempted to discuss these matters further with Mr. Wilson, but Mr. Wilson was unresponsive.

<u>The Kardashians Threaten to Terminate the License Agreement</u>

75.     On February 26, 2016, the Kardashians' outside counsel sent a letter to Hillair, asserting various breaches of the License Agreement by Haven and threatening to terminate the License on this basis if the alleged breaches were not cured within ten (10) days. For the first time in

16
COMPLAINT

this letter, the Kardashians asserted that the Term Sheet was ineffective because certain acts contemplated thereby (which were thwarted solely by the Kardashians' conduct) had not occurred. Among the breaches alleged by the Kardashians was an alleged failure to pay certain minimum guarantee payments under the License, despite the fact that the Kardashians had expressly committed to giving up those minimum guarantee payments under the Term Sheet.

76.     On March 11, 2016, Hillair responded through its counsel, informing the Kardashians that any notice under the License must be given to the proper party (*viz.*, Haven) and, moreover, that none of the grounds stated in the February 26 for termination of the License was valid.

77.     In the event that the Kardashians were to terminate the License, Haven would be immediately barred from further distributing the Kardashian Beauty line.  Hence, the mechanism created under the Term Sheet for Hillair and the Kardashians to mutually benefit from the distribution of the Kardashian Beauty line would be destroyed – after Hillair had acted in good faith under the Term Sheet to pour millions of dollars in funding into Haven for the sole purpose of distributing the Kardashians' line.

78.     Notably, because the Kardashians personally own the "Kardashian Beauty" trademark, in the event that they terminate the License, they could simply go on to sell the same rights to a new partner and continue on with their venture, having reaped the benefits of Hillair's *nearly $11 million capital injection* (in Boldface and Haven combined), while cutting Hillair out of any profits.  Such an act would be the ultimate breach of good faith and would destroy Hillair's ability to obtain the benefit of its investment in Haven and in its funding of the Kardashian's cosmetics line pursuant to the Term Sheet.

## FIRST CAUSE OF ACTION

### (Breach of Contract)

### Against All Defendants

79.     Plaintiffs repeat and reallege the allegations made in paragraphs 1 through 78 as if fully set forth herein.

80.     Plaintiffs and Defendants entered into a valid, binding, and enforceable agreement, namely the Term Sheet.

81.     Defendants breached their obligations under the Term Sheet.  Defendants' breaches include, without limitation: failing to effect and/or preventing the equity transfers specified in the Term Sheet; failing to effect and/or preventing the amendments of the License specified in the Term Sheet; and failing to effect and/or preventing other transactions contemplated by the Term Sheet.

82.     Based on the foregoing conduct and omissions, Defendants have materially breached their contractual obligations to Plaintiffs under the Term Sheet.  Defendants' breaches were knowing and willful.

83.     Plaintiffs have fully performed all of their material obligations under the Term Sheet, except insofar as those obligations have been waived by Defendants or excused by Defendants' failure to perform under the parties' agreement.

84.     As a direct, proximate, and foreseeable result of the conduct and omissions alleged above, Plaintiffs have suffered damages in an amount to be determined at trial, including without limitation the loss of approximately $10,170,000 in invested funds, plus the value of Hillair's equity interest in Haven, valued at between approximately $64,000,000 and $180,000,000 (using discounted cash flow analysis and/or comparable acquisition methods), plus prejudgment interest thereon.

### SECOND CAUSE OF ACTION

**(Breach of the Covenant of Good Faith and Fair Dealing)**

**Against All Defendants**

85.     Plaintiffs repeat and reallege the allegations made in paragraphs 1 through 84 as if fully set forth herein.

86.     Plaintiffs and Defendants entered into a valid, binding, and enforceable agreement, namely the Term Sheet.

87.     Plaintiffs have fully performed all of their material obligations under the Term Sheet, except insofar as those obligations have been waived by Defendants or excused by Defendants' failure to perform under the parties' agreement.

88.     Despite all conditions for Defendants' performance under the Agreements having occurred, Defendants unfairly interfered with Plaintiffs' right to receive the benefit of their bargain under contract through the actions and omissions alleged herein.  Defendants' acts and omissions

18

1   include, *inter alia*, undermining the ability of the Issuer (*viz.*, Newco/Haven) to effectively distribute

2   the Kardashian Beauty makeup line, including by failing to provide marketing and promotional

3   support, as they had for nearly two (2) years up to the signing of the Term Sheet, and by taking other

4   steps to undermine Plaintiffs' ability to receive a fair return on their investment under the Term Sheet.

5         89.    As a result of Defendants' conduct and omissions alleged herein, Defendants

6   undermined Plaintiffs' reasonable expectation of receiving the benefit of their bargain under the Term

7   Sheet, in violation of the implied covenant of good faith and fair dealing.

8         90.    As a direct, proximate, and foreseeable result of the conduct and omissions alleged

9   above, Plaintiffs have suffered damages in an amount to be determined at trial, including without

10   limitation the loss of approximately $10,170,000 in invested funds, plus the value of Hillair's equity

11   interest in Haven, valued at between approximately $64,000,000 and $180,000,000, plus prejudgment

12   interest thereon.

13   **THIRD CAUSE OF ACTION**

14   **(Breach of Fiduciary Duty)**

15   **Against All Defendants**

16         91.    Plaintiffs repeat and reallege the allegations made in paragraphs 1 through 90 as if fully

17   set forth herein.

18         92.    As memorialized in the Term Sheet, the parties entered into a joint venture and/or

19   general partnership between Plaintiffs and Defendants, the duration of which would last until such

20   time as the parties took their respective equity stakes in Newco/Haven, the entity to be created under

21   the Term Sheet as the mechanism for the parties' venture. While Plaintiffs took their equity stake in

22   Haven, Defendants failed and refused to do so. As a result, the joint venture and/or general partnership

23   between Plaintiffs and Defendants continued and continues on.

24         93.    Pursuant to the joint venture and/or general partnership created pursuant to the Term

25   Sheet, Defendants owe and, at all relevant times, did owe fiduciary duties to Plaintiffs in the conduct

26   of the acts contemplated by parties when they entered into the Term Sheet.

27         94.    Defendants' acts and omissions described herein breached their fiduciary duties to

28   Plaintiffs. Such acts and omissions include, without limitation, Defendants' refusal to consummate

FAYER GIPSON LLP

the transactions called for by the Term Sheet and taking steps to prevent the occurrence of such transactions, and by failing and refusing to take the steps necessary for Plaintiffs to reap the benefit of their investment in Haven and in the distribution of the Kardashian Beauty line, including by failing and refusing to market and promote the Kardashian Beauty line as they had for approximately two (2) years before entering into the Term Sheet.

95.     As a direct, proximate, and foreseeable result of the conduct and omissions alleged above, Plaintiffs have suffered damages in an amount to be determined at trial, including without limitation the loss of approximately $10,170,000 in invested funds, plus the value of Hillair's equity interest in Haven, valued at between approximately $64,000,000 and $180,000,000, plus prejudgment interest thereon.

96.     Because the acts and omissions of Defendants complained of herein were undertaken with fraud, oppression and/or malice, Plaintiffs are entitled to exemplary and punitive damages in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

### (Fraud/Deceit – Cal. Civ. Code § 1709)

### Against All Defendants

97.     Plaintiffs repeat and reallege the allegations made in paragraphs 1 through 96 as if fully set forth herein.

98.     Prior to entering into the Term Sheet, Defendants, through their representatives and agents, represented to Plaintiffs that the Kardashians would continue to fully market, promote and support the Kardashian Beauty makeup line, as they had been doing for the two (2) prior years with Boldface as the distributor.  Throughout the parties' negotiations regarding the Term Sheet in July 2014, the Kardashians' attorney, Todd Wilson, made repeated representations to Sean McAvoy of Hillair that if Hillair was the winning bidder for the Boldface assets in the auction process, Hillair would get the full benefit of the Kardashians' performance in support of the Kardashian Beauty line. Plaintiffs also relied on the Kardashians' public representations in press releases, such as that "Kourtney, Kim and Khloe are the inspiration and driving force behind every aspect of the [Kardashian Beauty line]," and on their conduct in actively marketing and promoting the Kardashian Beauty line

FAYER GIPSON LLP

to the public, including through personal appearances and through their blogs and social media, which gave and were intended to give the affirmative impression that the Kardashians would continue to market and support the Kardashian Beauty line once Hillair purchased the rights to distribute the line from Boldface.

99.     The aforesaid representations were false and, on information and belief, Defendants knew them to be false at the time that the representations were made, and/or made those representations with a reckless disregard for their truth.  Indeed, the fact that Defendants did not intend to fulfill their promises is clear from their actions, as the Kardashians at all relevant times prior to entering into the Term Sheet actively marketed and promoted and supported the line, and represented to the public that they were in fact the driving force behind the line, but after entering into the Term Sheet their promotion and marketing and support of the Kardashian Beauty line virtually ceased.

100.     Defendants intended Plaintiffs to rely on the aforesaid representations.  Specifically, Defendants' representations were intended to induce Plaintiffs to enter into the Term Sheet and to invest substantial sums of money in the distribution of the Kardashian Beauty line (via Boldface and Haven) in reliance on said representations.

101.     Plaintiffs did reasonably rely on Defendants' representations, including by entering into the Term Sheet and by investing substantial sums of money in the distribution of the Kardashian Beauty line (via Boldface and Haven) in reliance on said representations.

102.     Plaintiffs were harmed as a result of their reliance on Defendants' false representations, and Defendants' false representations were a substantial factor in causing Plaintiffs' harm.

103.     As a direct, proximate, and foreseeable result of the conduct and omissions alleged above, Plaintiffs have suffered damages in an amount to be determined at trial, including without limitation the loss of approximately $10,170,000 in invested funds, plus the value of Hillair's equity interest in Haven, valued at between approximately $64,000,000 and $180,000,000, plus prejudgment interest thereon.

104.     Because the acts and omissions of Defendants complained of herein were undertaken with fraud, oppression and/or malice, Plaintiffs are entitled to exemplary and punitive damages in an amount to be determined at trial.

# FIFTH CAUSE OF ACTION

## (Negligent Misrepresentation)

### Against All Defendants

105.    Plaintiffs repeat and reallege the allegations made in paragraphs 1 through 104 as if fully set forth herein.

106.    Prior to entering into the Term Sheet, Defendants, through their representatives and agents, represented to Plaintiffs that the Kardashians would continue to fully market, promote and support the Kardashian Beauty makeup line, as they had been doing for the two (2) prior years with Boldface as the distributor.  Throughout the parties' negotiations regarding the Term Sheet in July 2014, the Kardashians' attorney, Todd Wilson, made repeated representations to Sean McAvoy of Hillair that if Hillair was the winning bidder for the Boldface assets in the auction process, Hillair would get the full benefit of the Kardashians' performance in support of the Kardashian Beauty line. Plaintiffs also relied on the Kardashians' public representations in press releases, such as that "Kourtney, Kim and Khloe are the inspiration and driving force behind every aspect of the [Kardashian Beauty line]," and on their conduct in actively marketing and promoting the Kardashian Beauty line to the public, including through personal appearances and through their blogs and social media, which gave and were intended to give the affirmative impression that the Kardashians would continue to market and support the Kardashian Beauty line once Hillair purchased the rights to distribute the line from Boldface.

107.    Defendants' aforesaid representations were false and Defendants had no reasonable grounds for believing them to be true at the time when they were made.

108.    Defendants intended Plaintiffs to rely on the aforesaid representations.  Specifically, Defendants' representations were intended to induce Plaintiffs to enter into the Term Sheet and to invest substantial sums of money in the distribution of the Kardashian Beauty line (via Boldface and Haven) in reliance on said representations.

109.    Plaintiffs did reasonably rely on Defendants' representations, including by entering into the Term Sheet and by investing substantial sums of money in the distribution of the Kardashian Beauty line (via Boldface and Haven) in reliance on said representations.

110.   Plaintiffs were harmed as a result of their reliance on Defendants' false representations, and Defendants' false representations were a substantial factor in causing Plaintiffs' harm.

111.   As a direct, proximate, and foreseeable result of the conduct and omissions alleged above, Plaintiffs have suffered damages in an amount to be determined at trial, including without limitation the loss of approximately $10,170,000 in invested funds, plus the value of Hillair's equity interest in Haven, valued at between approximately $64,000,000 and $180,000,000, plus prejudgment interest thereon.

112.   Because the acts and omissions of Defendants complained of herein were undertaken with fraud, oppression and/or malice, Plaintiffs are entitled to exemplary and punitive damages in an amount to be determined at trial.

### SIXTH CAUSE OF ACTION

### (Negligent Misrepresentation)

### Against All Defendants

113.   Plaintiffs repeat and reallege the allegations made in paragraphs 1 through 112 as if fully set forth herein.

114.   After Plaintiffs won the bid for Boldface's assets and transferred them to Haven pursuant to the Term Sheet, Defendants, through their representatives and agents, including Todd Wilson, represented to Plaintiffs, both orally and in writing, that the Kardashians had qualified buyers – first Regnery, and later Azulade – to buy out Plaintiffs' interest in Haven.

115.   In particular, in or around October 2014, Defendants represented that Regnery was a qualified buyer who was ready, willing and able to buy out Plaintiffs' interest in Haven. On this basis, because the Kardashians' support was essential to Haven's ability to distribute the line, Plaintiffs reluctantly agreed to enter into a term sheet agreement with Regnery for the purchase of their interest in Haven. Regnery, however, turned out not to have the funds necessary to complete the transaction and the deal thus fell through in November 2014.

116.   In addition, in or about February 2015, Defendants represented that Azulade was a qualified buyer who was ready, willing and able to buy out Plaintiffs' interest in Haven. On this basis, because the Kardashians' support was essential to Haven's ability to distribute the line, Plaintiffs

reluctantly agreed to enter into a term sheet agreement with Azulade for the purchase of their interest in Haven.  Azulade, however, like Regnery, turned out not to have the funds necessary to complete the transaction.  The Azulade deal thus fell through in or about August 2015.

117.  Defendants' aforesaid representations were false and, though Defendants may have believed them to be true at the time they were made, Defendants had no reasonable grounds for believing them to be true at the time when they were made.

118.  Defendants intended Plaintiffs to rely on the aforesaid representations in forbearing from taking action to address Defendants' failure to fulfill their duties to market and promote the Kardashian Beauty line while the buyout negotiations were in process – namely, from shortly after the asset purchase in October 2014 through approximately November 2015.

119.  Plaintiffs reasonably relied on Defendants' representations in forbearing from taking action to address Defendants' failure to fulfill their duties to market and promote the Kardashian Beauty line throughout the relevant time period.

120.  Plaintiffs were harmed as a result of their reliance on Defendants' false representations, and Defendants' false representations were a substantial factor in causing Plaintiff's harm.

121.  As a direct, proximate, and foreseeable result of the conduct and omissions alleged above, Plaintiffs have suffered damages in an amount to be determined at trial, plus prejudgment interest thereon.

122.  Because the acts and omissions of Defendants complained of herein were undertaken with fraud, oppression and/or malice, Plaintiffs are entitled to exemplary and punitive damages in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION

### (Promissory Estoppel)

### Against All Defendants

123.  Plaintiffs repeat and reallege the allegations made in paragraphs 1 through 122 as if fully set forth herein.

124.  Prior to entering into the Term Sheet and as an inducement thereof, Defendants, through their authorized representatives and agents, clearly and unambiguously promised Plaintiffs

FAYER GIPSON LLP

1   that the Kardashians would continue to fully market, promote and support the Kardashian Beauty

2   makeup line, as they had been doing for the two (2) prior years with Boldface as the distributor.

3         125.   Notwithstanding the foregoing, Defendants failed to do the acts promised.

4         126.   The aforesaid promise was intended to induce Plaintiffs to enter into the Term Sheet

5   and to invest substantial sums of money in the distribution of the Kardashian Beauty line (via Boldface

6   and Haven) in reliance on said promise.

7         127.   Plaintiffs did in fact enter into the Term Sheet and invest substantial sums of money in

8   the distribution of the Kardashian Beauty line (via Boldface and Haven), and did so in reasonable

9   reliance on the aforesaid promises.

10         128.   Plaintiffs were injured as a direct, proximate, and foreseeable result of its reliance on

11   Defendants' promises, and has suffered damages in an amount to be determined at trial, including

12   without limitation the loss of approximately $10,170,000 in invested funds, plus the value of Hillair's

13   equity interest in Haven, valued at between approximately $64,000,000 and $180,000,000 (using

14   discounted cash flow analysis and/or comparable acquisition methods), plus prejudgment interest

15   thereon.

16         129.   Injustice can be avoided only through enforcement of the aforesaid promises.

17

18                     **PRAYER FOR RELIEF**

19         WHEREFORE, Plaintiffs pray for judgment against all Defendants, and each of them, as

20   follows:

21         A.   For an award of damages in an amount to be ascertained at trial, including without

22   limitation the loss of approximately $10,170,000 in invested funds, plus the value of Hillair's equity

23   interest in Haven, valued at between approximately $64,000,000 and $180,000,000;

24         B.   For prejudgment interest on said amounts at the maximum rate;

25         C.   For an award of exemplary and punitive damages in an amount to be ascertained at

26   trial;

27         D.   For specific enforcement of Defendants' promises;

28         E.   For Plaintiffs' attorneys' fees and costs to the extent permitted by law;

FAYER GIPSON LLP

F.    For such other and further relief as the Court may deem just and proper.

DATED:  March 21, 2016

FAYER GIPSON LLP
GREGORY A. FAYER
MICHELLE K. MILLARD
STEVEN G. EDWARDS


By
    GREGORY A. FAYER
Attorneys for Plaintiffs Hillair Capital Management
LLC and Hillair Capital Investments LP

26
COMPLAINT

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby request a trial by jury.

DATED:  March 21, 2016

FAYER GIPSON LLP
GREGORY A. FAYER
MICHELLE K. MILLARD
STEVEN G. EDWARDS

By _____
    GREGORY A. FAYER
Attorneys for Plaintiffs Hillair Capital Management
LLC and Hillair Capital Investments LP

BLUEBIRDonline.com (888-477-0700)

Exhibit A

### *Newco Beauty Company*
### *Offering of Common Equity*

*This Term Sheet sets forth the principal terms pursuant to which, subject to certain conditions set forth herein, Investors would agree to purchase certain securities of a newly organized Issuer, and Issuer would sell such securities to the Investors (the "Transaction"). The Transaction is expressly conditioned upon Issuer being the purchaser of substantially all the assets of Boldface, Inc. ("Boldface") free and clear of any liens, claims and encumbrances of third parties.  Subject in all events to the immediately preceding sentence, this Term Sheet is intended to be binding upon the parties hereto and each party hereto may rely on the undertakings set forth herein.*

| | |
|---|---|
| **Issuer:** | Newco Beauty Company. |
| **Investors:** | Kardashian Family vehicles or its or their designees (collectively, "KFV") and Hillair Capital Investments L.P. ("HCI"). |
| **Subscription Amount:** | At least $2,000,000 representing HCI's credit bid (the "Credit Bid") of a material portion of HCI's secured debt of Boldface in a contemplated sale of substantially all the assets of Boldface to Issuer in a state or federal insolvency proceeding mutually acceptable to KFV and HCI; and |
| | $3,200,000 (less any amounts invested in Boldface after July 22, 2014, which will be added to the Credit Bid) representing equity capital invested in Issuer by HCI on or before the Closing and equaling, together with the Credit Bid, 51% of the fully diluted equity value (including CEO equity reward program described below) of Issuer as of the Closing; and |
| | KFV will receive 40% of the fully diluted equity value of Issuer as of the Closing and representing the value of the agreement of KFV and affiliates to consent to the sale and transfer from Boldface to Issuer of the KFV License (as defined below). |
| **Anti-dilution:** | In the event that Issuer issues or grants additional equity securities or debt securities convertible into equity securities (including any re-pricing of any right to common stock) based on an aggregate enterprise valuation of $10,000,000 or less, KFV's equity interests will be subject to a full ratchet broad based adjustment to eliminate dilution such that KFV's equity interests shall always represent 40% of the outstanding economic interest in Issuer.  In the event of an issuance of equity or debt securities involving tranches or other multiple closings, the antidilution adjustment shall be calculated as if all such securities were issued at the closing. These antidilution provisions shall continue indefinitely. |
| **Closing:** | Expected with four weeks of signing this Term Sheet. |
| **Conditions:** | Issuer will either have (i) **REDACTED** or (ii) purchased In either case, Issuer will have obtained a release in favor of |
| | Issuer shall have obtained free and clear title to the License Agreement, dated as of May 12, 2012, between Boldface and affiliates of the KFV (the "KFV License").  KFV and its affiliates will consent to the sale and transfer or assignment, as the case may be, of the KFV License to Issuer if all the other conditions set forth in this Term Sheet to be performed have been satisfied in all respects;  provided that KFV may not refuse to give such consent if a condition is not satisfied due solely to KFV's failure to perform any of its obligations hereunder. |

*Ex. A*

The KFV License shall have been amended by KFV and Issuer to provide for the elimination of minimum required payments and will be amended to provide for additional indemnification (including indemnification with respect to the transactions contemplated hereby and liabilities resulting therefrom and indemnification with respect to the Tillett matter (collectively, the "Reorganization Indemnification")) and insurance for the benefit of and satisfactory to KFV. Issuer shall have established an escrow of $300,000 with a third-party escrow agent reasonably acceptable to KFV to secure Issuer's Reorganization Indemnification obligations. The escrow shall be for a term of 18 months (but shall be extended and maintained with respect to any claim made during such 18 month period).

Issuer will have established an equity award program providing the Chief Executive Officer of Issuer (the "CEO") with a grant of 5% of the fully diluted equity of Issuer as of the Closing as well as performance based equity awards with a four-year vesting schedule entitling the CEO to an additional 4% of the fully diluted equity of Issuer as measured at Closing. In addition, Issuer will provide the CEO with indemnification with respect to the transactions contemplated hereby and liabilities resulting therefrom and with respect to the Tillett matter)

Investors and the CEO will negotiate mutually acceptable governance arrangements for Issuer. Such provisions will include, at a minimum: (a) Board seats for KFV designees (representing at least 40% of the overall Board vote (rounded down to the nearest whole number)), (b) KFV consent required for issuance of preferred stock or other securities having rights or preferences senior to the common stock or incurrence of any non-trade debt, (c) tag-along rights and (d) registration rights at least as favorable as those granted to HCI.

**Documentation:** The definitive documentation for the Transaction will contain provisions customary for a transaction of this nature.

**Investor Counsel:** Ellenoff Grossman & Schole LLP and Olshan Frome Wolosky LLP

**Fees:** Issuer will pay $40,000 (and cover all reasonable travel expenses) to Hillair Capital Management LLC at Closing as the Issuer's due diligence expense related to the Transaction.

Issuer will pay the reasonable fees and expenses of Investor Counsel on the Closing Date.

Issuer will pay the reasonable fees and expenses of Kinsella Weitzman Iser Kump & Aldisert LLP on the Closing Date or pursuant to a mutually agreed payment plan.

Issuer will pay the reasonable fees and expenses of Allen Grodsky, Esq. on the Closing Date or pursuant to a mutually agreed payment plan.

**Expiration Date:** This Term Sheet will expire, unless executed by each of the Investors or extended in writing, on August 1, 2014 at 5pm PDT.

2Die4Kourt, Inc.

By: _____
Name: Kourtney Kardashian
Title: President

Kimsaprincess, Inc.

By: _Kim Kardashian_
Name: Kim Kardashian
Title: President

Khlomoney, Inc.

By: _____
Name:
Title:

HILLAIR CAPITAL MANAGEMENT LLC

By: _____
Name: _Sean M. McAvoy_
Its: _Managing Member_

Kimsaprincess, Inc.

By: _____
Name:
Title:

Khlomoney, Inc.

By: _Khla Kle_
Name: Khloe Kardashian
Title: President

HILLAIR CAPITAL MANAGEMENT LLC

By: _____
Name: _Sean M. McAvay_
Its: _Managing Member_

Exhibit B

## BILL OF SALE

This Bill of Sale, dated as of October 22, 2014 (this "Bill of Sale"), is made by and between DAVID P. STAPLETON of the Stapleton Group, solely in his capacity as court-appointed receiver (in such capacity, the "Receiver") for Boldface Group, Inc., a Nevada corporation and Boldface Licensing + Branding, a Nevada corporation (collectively, "Boldface") and Newco Beauty Company, Inc., a Delaware corporation an affiliate of Hillair Capital Management, LLC (the "Buyer").

WHEREAS, on August 29, 2014, Hillair Capital Investments L.P. a Cayman Islands limited partnership ("Hillair") initiated litigation (the "Litigation") by filing a Verified Complaint for: (1) Breach of Contract, (2) Breach of Contract (Guaranty) and (3) Replevin, as Case No. SC123052 in the Superior Court of the State of California in and for the County of Los Angeles, West District (the "Court");

WHEREAS, on September 3, 2014, the Court entered its interim order appointing David P. Stapleton as Receiver over the assets and personal property of Boldface in the Litigation (the "Receivership Order");

WHEREAS, the Receivership Order and other orders of the Court authorize the Receiver to take possession of, manage and control the personal property and other assets of Boldface (the "Receivership Estate"), and to sell, liquidate and/or otherwise dispose of all or any portion of the Receivership Estate, with the consent of the Court;

WHEREAS, following an auction held on October 15, 2014, the Receiver accepted, as the highest and best offer to purchase the Receivership Estate, a bid in the amount of $3,800,000.00 made by the Buyer (the "Purchase Price").

WHEREAS, pursuant to that certain Asset Purchase Agreement ("APA"), dated as of October 15, 2014, between the Receiver and the Buyer, the Receiver has agreed to close the sale of all of Boldface's right, title and interest in the assets listed on Exhibit A hereto (the "Acquired Assets") to the Buyer on an "AS-IS, WHERE-IS" basis and without representations or warranties of any kind, nature or description by the Receiver, Boldface or its agents and free and clear of all liens, claims, adverse claims of ownership, and other interests ("Liens"), if any, in exchange for the Purchase Price.

NOW, THEREFORE, in consideration of the premises contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

1.    The Receiver, on behalf of Boldface, hereby grants, sells, conveys, assigns, transfers and delivers to the Buyer all of its right, title and interest in and to the Acquired Assets, on an "AS-IS, WHERE-IS" basis and without representations or warranties of any kind, nature or description by the Receiver or its agents and subject to all Liens, if any.

2.    This Bill of Sale is being executed by the Receiver and the Buyer and shall be binding upon each of the Receiver, Boldface and the Buyer and their respective successors and

*EX. B*

assigns, for the respective uses and purposes herein set forth and referred to, and shall be effective as of the date hereof.

3.      No provision of this Bill of Sale, express or implied, is intended or shall be construed to confer upon or give to any person, other than the parties hereto and their respective successors and permitted assigns, any remedy or claim under or by reason of this Bill of Sale or any term, covenant or condition hereof, and all of the terms, covenants, conditions, promises and agreements contained in this Bill of Sale shall be for the sole and exclusive benefit of each of the Receiver, Boldface and the Buyer, their respective successors and permitted assigns.

4.      This Bill of Sale may not be modified or amended except by an instrument or instruments in writing signed by the Receiver and the Buyer. The Buyer may, only by an instrument in writing, waive compliance by the Receiver with any term or provision hereof on the part of the Receiver to be performed or caused to be performed or complied with or caused to be complied with. No failure or delay of the Buyer in exercising any right or remedy hereunder shall operate as a waiver thereof, nor will any single or partial exercise of any right or power, or any abandonment or discontinuance of steps to enforce such right or power, preclude any other or further exercise thereof or the exercise of any other right or power.

5.      This Bill of Sale shall be construed, performed and enforced in accordance with, and governed by, the internal laws of the State of California, without giving effect to the principles of conflicts of laws thereof.

6.      This Bill of Sale may be executed in any number of counterparts, and any party hereto may execute any such counterpart, each of which when executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute but one and the same instrument. This Bill of Sale shall become effective when each party hereto shall have received a counterpart hereof signed by the other party hereto. The parties agree that the delivery of this Bill of Sale may be effected by means of an exchange of facsimile or electronically transferred signatures.

*Signature Page Follows*]

IN WITNESS WHEREOF, the parties hereto have caused this Bill of Sale to be duly executed by their respective authorized officers as of the date first above written.

THE BUYER:

**NEWCO BEAUTY COMPANY, INC.,** a
Delaware corporation

By: _____

Name:  Sean M. McAvoy
Title:  Director

Signature Page to Bill of Sale

**THE RECEIVER:**

**DAVID P. STAPLETON**, solely in his capacity as
court-appointed Receiver for **Boldface Group, Inc**. and
**Boldface Licensing + Branding**,

By: _____

Name: David P. Stapleton

**Exhibit A to Bill of Sale**

ACQUIRED ASSETS

1.    all trademarks, service marks, trade names, service names, brand names, trade dress rights, logos, corporate names, and general intangibles of a like nature owned by Boldface and listed on Schedule 1.1(a) attached to the APA (the "Trademarks") together with the goodwill of any business symbolized thereby and all applications, registrations, and renewals related thereto (subject to Boldface's right to the continued use thereof through and including the Closing Date);

2.    all domain names and URLs owned by Boldface and listed on Schedule 1.1(b) attached to the APA (subject to Boldface's right to the continued use thereof through and including the Closing Date);

3.    all customer data relating to customers of Boldface that relate to the Acquired Assets;

4.    all inventory, including all raw materials, work-in-progress, finished goods, spare parts, packaging materials, factory supplies, perishable tooling, maintenance repairs and other supplies that are owned by any of Boldface or subject to a lease or license, in each case, to the extent used in, or to the extent related to, the Business, the Acquired Assets or the Assumed Liabilities, including such inventory held at any location controlled by any of Boldface, such inventory previously purchased and in transit and any such inventory paid for but not yet delivered or received by Boldface;

5.    all accounts, accounts receivable and other rights to payments (including notes receivable), of Boldface;

6.    all rights, claims, credits, causes of action, refunds or rights of set-off or recoupment, whether choate or inchoate, known or unknown, contingent or non-contingent, of Boldface to the extent used in, or to the extent related to, the Business, the Acquired Assets or the Assumed Liabilities (other than those exclusively related to an Excluded Asset or an Excluded Liability), including (i) to the extent transferable, all rights and claims pursuant to guarantees, representations, warranties, indemnities and similar rights made by suppliers, manufacturers, contractors and other third parties in favor of Boldface in respect of the Business, the Acquired Assets, or the Assumed Liabilities, and (ii) all claims against trade creditors accruing in favor of the Receivership Estate;

7.    all general intangibles;

8.    all tangible property and interests therein, including all machinery, equipment, furniture, vehicles, tools, tooling, dies, fixtures, computers (including all computer hardware, networking and communication assets and servers) and maintenance parts and other items of tangible personal property (collectively, "Personal Property") owned by Boldface or subject to a lease or license in favor of Boldface, in each case, to the extent

used in, or to the extent related to, the Business, the Purchased Assets or the Assumed Liabilities, and including such Personal Property held at any location controlled by Boldface, such Personal Property previously purchased and in transit and any such Personal Property held by a customer or prospective customer of Boldface, and (B) all Personal Property held at or regularly used at any Leased Real Property;

9.  all credits, pre-paid expenses, advance payments, prepayments, security deposits, deferred charges, letters of credit and other deposits, and claims for refunds or reimbursements and other assets, in each case, to the extent used in, or to the extent related to, the Business or any of the other Acquired Assets or the Assumed Liabilities, and any claim, cause of action, remedy or right related to the foregoing;

10. all of Boldface's rights and interests under the leases of real property identified on Schedule 1.1(j) attached to the APA ("Real Estate Leases" and the real property leased by Boldface pursuant to the Real Estate Leases, the "Leased Real Property") including the rights to all deposits made thereunder;

11. all licenses held by Boldface (other than the Primary License, as defined below), to the extent transferable by Boldface and subsequent to the limitations set forth in Section 4.5 below;

12. all insurance proceeds and rights to insurance proceeds under any insurance policies of Boldface with respect to the Business, the Acquired Assets or the Assumed Liabilities except for any insurance proceeds or rights to insurance proceeds under any insurance policies of Boldface that are Excluded Assets;

13. all goodwill of Boldface to the extent related to the Business, the Acquired Assets or the Assumed Liabilities;

14. copies of all business records to the extent related to the Acquired Assets and Assumed Liabilities;

15. all rights under that certain "Licensing Agreement" dated as of May 9, 2012, by and among 2Die4Kourt, Inc., a California corporation, Kimsaprincess, Inc., a California corporation, Kloemoney, Inc., a California corporation, as licensors (collectively, the "Primary Licensors") and Boldface Licensing + Branding, a Nevada corporation, a licensee (the "Primary License"), but subject to the limitations set forth in Section 4.5 hereof; and

16. all other assets, property and rights not enumerated as Acquired Assets in this Exhibit A hereof, but specifically excluding the Excluded Assets enumerated in Exhibit B below.

## EXHIBIT B

### Excluded Assets

1. all cash on hand and in banks, cash equivalents, investments, checks received (but not deposited or cleared);

2. all tax refunds and all other refunds of whatever type or category;

3. Boldface's business records related to the Excluded Assets and Excluded Liabilities;

4. any documents or records covered by attorney client privilege, attorney work product privilege or other legal privilege of Boldface;

5. any Directors and Officers liability insurance policies held by Boldface and all rights thereunder; and

6. all rights of the Receiver and Boldface arising under this Agreement (including all rights to the Purchase Price) and under any other agreement between the Receiver and the Buyer entered into in connection with this Agreement.

Exhibit C

## INSTRUMENT OF TRANSFER AND ASSIGNMENT

This Instrument of Transfer and Assignment, dated as of October 22, 2014 (this "Instrument"), is made by and between DAVID P. STAPLETON, solely in his capacity as court-appointed receiver (in such capacity, the "Receiver") for Boldface Group, Inc., a Nevada corporation and Boldface Licensing + Branding, a Nevada corporation (collectively, "Boldface") and Newco Beauty Company, Inc., a Delaware corporation an affiliate of Hillair Capital Management, LLC (the "Buyer") and is delivered in accordance with that certain Asset Purchase Agreement dated as of October 15, 2014 between the Receiver and the Buyer (the "APA").

WHEREAS, concurrent with the execution of this Instrument, the Buyer has executed a Bill of Sale to transfer the tangible assets to the Buyer in accordance with the APA;

NOW, THEREFORE, in consideration of the premises contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

1.    The Receiver, on behalf of Boldface, hereby grants, sells, conveys, assigns, transfers and delivers to the Buyer all of its right, title and interest in and to the Assets, on an "AS-IS, WHERE-IS" basis and without representations or warranties other than as set forth in the APA, which Acquired Assets are set forth in Exhibit A attached hereto, and shall specifically exclude the Excluded Assets set forth on Exhibit B attached hereto.

2.    This Instrument is being executed by the Receiver and the Buyer and shall be binding upon each of the Receiver, Boldface and the Buyer and their respective successors and assigns, for the respective uses and purposes herein set forth and referred to, and shall be effective as of the date hereof.

3.    No provision of this Instrument, express or implied, is intended or shall be construed to confer upon or give to any person, other than the parties hereto and their respective successors and permitted assigns, any remedy or claim under or by reason of this Instrument or any term, covenant or condition hereof, and all of the terms, covenants, conditions, promises and agreements contained in this Instrument shall be for the sole and exclusive benefit of each of the Receiver, Boldface and the Buyer, their respective successors and permitted assigns.

4.    This Instrument may not be modified or amended except by an instrument or instruments in writing signed by the Receiver and the Buyer. The Buyer may, only by an instrument in writing, waive compliance by the Receiver with any term or provision hereof on the part of the Receiver to be performed or caused to be performed or complied with or caused to be complied with. No failure or delay of the Buyer in exercising any right or remedy hereunder shall operate as a waiver thereof, nor will any single or partial exercise of any right or power, or any abandonment or discontinuance of steps to enforce such right or power, preclude any other or further exercise thereof or the exercise of any other right or power.

US_101651372v2

Ex. C

5.   This Instrument shall be construed, performed and enforced in accordance with, and governed by, the internal laws of the State of California, without giving effect to the principles of conflicts of laws thereof.

6.   This Instrument may be executed in any number of counterparts, and any party hereto may execute any such counterpart, each of which when executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute but one and the same instrument. This Instrument shall become effective when each party hereto shall have received a counterpart hereof signed by the other party hereto. The parties agree that the delivery of this Instrument may be effected by means of an exchange of facsimile or electronically transferred signatures.

*[Remainder of Page Intentionally Left Blank]*

-2-

US_101651372v2

IN WITNESS WHEREOF, the parties hereto have caused this Instrument to be duly executed by their respective authorized officers as of the date first above written.

**THE BUYER:**

**NEWCO BEAUTY COMPANY, INC.**, a
Delaware corporation

By: _Sean M McAvoy_
Name: Sean M. McAvoy
Title: Director

Signature Page to Instrument of Transfer and Assignment

**THE RECEIVER:**

**DAVID P. STAPLETON**, solely in his capacity as court-appointed Receiver for **Boldface Group, Inc**. and **Boldface Licensing + Branding,**

By: _____

Name: David P. Stapleton

## EXHIBIT A

### Acquired Assets

1.      all trademarks, service marks, trade names, service names, brand names, trade dress rights, logos, corporate names, and general intangibles of a like nature owned by Boldface and listed on Schedule 1.1(a) attached to the APA (the "Trademarks") together with the goodwill of any business symbolized thereby and all applications, registrations, and renewals related thereto (subject to Boldface's right to the continued use thereof through and including the Closing Date);

2.      all domain names and URLs owned by Boldface and listed on Schedule 1.1(b) attached to the APA (subject to Boldface's right to the continued use thereof through and including the Closing Date);

3.      all customer data relating to customers of Boldface that relate to the Acquired Assets;

4.      all inventory, including all raw materials, work-in-progress, finished goods, spare parts, packaging materials, factory supplies, perishable tooling, maintenance repairs and other supplies that are owned by any of Boldface or subject to a lease or license, in each case, to the extent used in, or to the extent related to, the Business, the Acquired Assets or the Assumed Liabilities, including such inventory held at any location controlled by any of Boldface, such inventory previously purchased and in transit and any such inventory paid for but not yet delivered or received by Boldface;

5.      all accounts, accounts receivable and other rights to payments (including notes receivable), of Boldface;

6.      all rights, claims, credits, causes of action, refunds or rights of set-off or recoupment, whether choate or inchoate, known or unknown, contingent or non-contingent, of Boldface to the extent used in, or to the extent related to, the Business, the Acquired Assets or the Assumed Liabilities (other than those exclusively related to an Excluded Asset or an Excluded Liability), including (i) to the extent transferable, all rights and claims pursuant to guarantees, representations, warranties, indemnities and similar rights made by suppliers, manufacturers, contractors and other third parties in favor of Boldface in respect of the Business, the Acquired Assets, or the Assumed Liabilities, and (ii) all claims against trade creditors accruing in favor of the Receivership Estate;

7.      all general intangibles;

8.      all tangible property and interests therein, including all machinery, equipment, furniture, vehicles, tools, tooling, dies, fixtures, computers (including all computer hardware, networking and communication assets and servers) and maintenance parts and other items of tangible personal property (collectively, "Personal Property") owned by Boldface or subject to a lease or license in favor of Boldface, in each case, to the extent used in, or to the extent related to, the Business, the Purchased Assets or the Assumed Liabilities, and including such Personal Property held at any location controlled by

-4-

Boldface, such Personal Property previously purchased and in transit and any such Personal Property held by a customer or prospective customer of Boldface, and (B) all Personal Property held at or regularly used at any Leased Real Property;

9.      all credits, pre-paid expenses, advance payments, prepayments, security deposits, deferred charges, letters of credit and other deposits, and claims for refunds or reimbursements and other assets, in each case, to the extent used in, or to the extent related to, the Business or any of the other Acquired Assets or the Assumed Liabilities, and any claim, cause of action, remedy or right related to the foregoing;

10.     all of Boldface's rights and interests under the leases of real property identified on Schedule 1.1(j) attached to the APA ("Real Estate Leases") and the real property leased by Boldface pursuant to the Real Estate Leases, the "Leased Real Property") including the rights to all deposits made thereunder;

11.     all licenses held by Boldface (other than the Primary License, as defined below), to the extent transferable by Boldface and subsequent to the limitations set forth in Section 4.5 below;

12.     all insurance proceeds and rights to insurance proceeds under any insurance policies of Boldface with respect to the Business, the Acquired Assets or the Assumed Liabilities except for any insurance proceeds or rights to insurance proceeds under any insurance policies of Boldface that are Excluded Assets;

13.     all goodwill of Boldface to the extent related to the Business, the Acquired Assets or the Assumed Liabilities;

14.     copies of all business records to the extent related to the Acquired Assets and Assumed Liabilities;

15.     all rights under that certain "Licensing Agreement" dated as of May 9, 2012, by and among 2Die4Kourt, Inc., a California corporation, Kimsaprincess, Inc., a California corporation, Kloemoney, Inc., a California corporation, as licensors (collectively, the "Primary Licensors") and Boldface Licensing + Branding, a Nevada corporation, a licensee (the "Primary License"), but subject to the limitations set forth in Section 4.5 hereof; and

16.     all other assets, property and rights not enumerated as Acquired Assets in this Exhibit A hereof, but specifically excluding the Excluded Assets enumerated in Exhibit B below.

-5-

**EXHIBIT B**

Excluded Assets

1. all cash on hand and in banks, cash equivalents, investments, checks received (but not deposited or cleared);

2. all tax refunds and all other refunds of whatever type or category;

3. Boldface's business records related to the Excluded Assets and Excluded Liabilities;

4. any documents or records covered by attorney client privilege, attorney work product privilege or other legal privilege of Boldface;

5. any Directors and Officers liability insurance policies held by Boldface and all rights thereunder; and

6. all rights of the Receiver and Boldface arising under this Agreement (including all rights to the Purchase Price) and under any other agreement between the Receiver and the Buyer entered into in connection with this Agreement.

US_101651372v2



**CM-010**

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| — Gregory A. Fayer (SBN: 232303)<br>Fayer Gipson LLP<br>2029 Century Park East, Suite 3535<br>Los Angeles, CA 90067<br>TELEPHONE NO.: 310-557-3558        FAX NO.: 310-557-3589<br>ATTORNEY FOR (Name): Plaintiffs Hillair Capital Management LLC, et al. | **ORIGINAL**<br><br>**FILED**<br>Superior Court of California<br>County of Los Angeles<br><br>MAR 21 2016<br><br>Sherri R. Carter, Executive Officer/Clerk<br>By _Cristina Grijalva_ Deputy<br>Cristina Grijalva |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF  Los Angeles, Western Division
STREET ADDRESS: 111 North Hill Street
MAILING ADDRESS: 111 North Hill Street
CITY AND ZIP CODE: Los Angeles, CA 90012
BRANCH NAME: Stanley Mosk Courthouse

CASE NAME:
Hillair Capital Management LLC, et al. v. Kim Kardashian, et al.

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER |
|---|---|---|---|---|
| ☑ **Unlimited**<br>(Amount demanded exceeds $25,000) | ☐ **Limited**<br>(Amount demanded is $25,000 or less) | ☐ Counter  ☐ Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | | **BC 614374** |
| | | | | JUDGE: |
| | | | | DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

| Auto Tort | Contract | Provisionally Complex Civil Litigation<br>(Cal. Rules of Court, rules 3.400–3.403) |
|---|---|---|
| ☐ Auto (22) | ☐ Breach of contract/warranty (06) | ☐ Antitrust/Trade regulation (03) |
| ☐ Uninsured motorist (46) | ☐ Rule 3.740 collections (09) | ☐ Construction defect (10) |
| **Other PI/PD/WD (Personal Injury/Property**<br>**Damage/Wrongful Death) Tort** | ☐ Other collections (09) | ☐ Mass tort (40) |
| ☐ Asbestos (04) | ☐ Insurance coverage (18) | ☐ Securities litigation (28) |
| ☐ Product liability (24) | ☑ Other contract (37) | ☐ Environmental/Toxic tort (30) |
| ☐ Medical malpractice (45) | **Real Property** | ☐ Insurance coverage claims arising from the |
| ☐ Other PI/PD/WD (23) | ☐ Eminent domain/Inverse<br>condemnation (14) | above listed provisionally complex case<br>types (41) |
| **Non-PI/PD/WD (Other) Tort** | ☐ Wrongful eviction (33) | **Enforcement of Judgment** |
| ☐ Business tort/unfair business practice (07) | ☐ Other real property (26) | ☐ Enforcement of judgment (20) |
| ☐ Civil rights (08) | **Unlawful Detainer** | **Miscellaneous Civil Complaint** |
| ☐ Defamation (13) | ☐ Commercial (31) | ☐ RICO (27) |
| ☐ Fraud (16) | ☐ Residential (32) | ☐ Other complaint (*not specified above*) (42) |
| ☐ Intellectual property (19) | ☐ Drugs (38) | **Miscellaneous Civil Petition** |
| ☐ Professional negligence (25) | **Judicial Review** | ☐ Partnership and corporate governance (21) |
| ☐ Other non-PI/PD/WD tort (35) | ☐ Asset forfeiture (05) | ☐ Other petition (*not specified above*) (43) |
| **Employment** | ☐ Petition re: arbitration award (11) | |
| ☐ Wrongful termination (36) | ☐ Writ of mandate (02) | |
| ☐ Other employment (15) | ☐ Other judicial review (39) | |

2. This case ☐ is  ☑ is not    complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties        d. ☐ Large number of witnesses
   b. ☐ Extensive motion practice raising difficult or novel    e. ☐ Coordination with related actions pending in one or more courts
      issues that will be time-consuming to resolve                in other counties, states, or countries, or in a federal court
   c. ☐ Substantial amount of documentary evidence            f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply)*: a. ☑ monetary    b. ☐ nonmonetary; declaratory or injunctive relief    c. ☑ punitive
4. Number of causes of action *(specify)*:  Seven (7)
5. This case ☐ is  ☑ is not    a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: March 21, 2016
Gregory A. Fayer
_____                    ▶ _____
       (TYPE OR PRINT NAME)                                          (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on **all** other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>www.courtinfo.ca.gov |

**CM-010**

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property
   Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
Asbestos (04)
   Asbestos Property Damage
   Asbestos Personal Injury/
      Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
   Medical Malpractice–
      Physicians & Surgeons
   Other Professional Health Care
      Malpractice
Other PI/PD/WD (23)
   Premises Liability (e.g., slip
      and fall)
   Intentional Bodily Injury/PD/WD
      (e.g., assault, vandalism)
   Intentional Infliction of
      Emotional Distress
   Negligent Infliction of
      Emotional Distress
   Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
   Practice (07)
Civil Rights (e.g., discrimination,
   false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel)
   (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
   Legal Malpractice
   Other Professional Malpractice
      *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
   Breach of Rental/Lease
      Contract *(not unlawful detainer or wrongful eviction)*
   Contract/Warranty Breach–Seller
      Plaintiff *(not fraud or negligence)*
   Negligent Breach of Contract/
      Warranty
   Other Breach of Contract/Warranty
Collections (e.g., money owed, open
   book accounts) (09)
   Collection Case–Seller Plaintiff
   Other Promissory Note/Collections
      Case
Insurance Coverage *(not provisionally complex)* (18)
   Auto Subrogation
   Other Coverage
Other Contract (37)
   Contractual Fraud
   Other Contract Dispute

**Real Property**
Eminent Domain/Inverse
   Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
   Writ of Possession of Real Property
   Mortgage Foreclosure
   Quiet Title
   Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
   Writ–Administrative Mandamus
   Writ–Mandamus on Limited Court
      Case Matter
   Writ–Other Limited Court Case
      Review
Other Judicial Review (39)
   Review of Health Officer Order
   Notice of Appeal–Labor
      Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
   *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
   Abstract of Judgment (Out of
      County)
   Confession of Judgment *(non-domestic relations)*
   Sister State Judgment
   Administrative Agency Award
      *(not unpaid taxes)*
   Petition/Certification of Entry of
      Judgment on Unpaid Taxes
   Other Enforcement of Judgment
      Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
   Declaratory Relief Only
   Injunctive Relief Only *(non-harassment)*
   Mechanics Lien
   Other Commercial Complaint
      Case *(non-tort/non-complex)*
   Other Civil Complaint
      *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate
   Governance (21)
Other Petition *(not specified above)* (43)
   Civil Harassment
   Workplace Violence
   Elder/Dependent Adult
      Abuse
   Election Contest
   Petition for Name Change
   Petition for Relief From Late
      Claim
   Other Civil Petition

CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Page 2 of 2

ORIGINAL

| SHORT TITLE: Hillair Capital Management LLC, et al. v. Kim Kardashian, et al. | CASE NUMBER BC 6 1 4 3 7 4 |
|---|---|

## CIVIL CASE COVER SHEET ADDENDUM AND
## STATEMENT OF LOCATION
## (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

**This form is required pursuant to Local Rule 2.3 in all new civil case filings in the Los Angeles Superior Court.**

**Item I**. Check the types of hearing and fill in the estimated length of hearing expected for this case:

JURY TRIAL? ✓YES      CLASS ACTION? YES  LIMITED CASE? YES  TIME ESTIMATED FOR TRIAL 10____ HOURS/✓DAYS

**Item II. Indicate** the correct district and courthouse location (4 steps – If you checked "Limited Case", skip to Item III, Pg. 4):

**Step 1:** After first completing the Civil Case Cover Sheet form, find the main Civil Case Cover Sheet heading for your case in the left margin below, and, to the right in Column **A**, the Civil Case Cover Sheet case type you selected.

**Step 2:** Check **one** Superior Court type of action in Column **B** below which best describes the nature of this case.

**Step 3:** In Column **C**, circle the reason for the court location choice that applies to the type of action you have checked. For any exception to the court location, see Local Rule 2.3.

| Applicable Reasons for Choosing Courthouse Location (see Column C below) |
|---|

1. Class actions must be filed in the Stanley Mosk Courthouse, central district.
2. May be filed in central (other county, or no bodily injury/property damage).
3. Location where cause of action arose.
4. Location where bodily injury, death or damage occurred.
5. Location where performance required or defendant resides.
6. Location of property or permanently garaged vehicle.
7. Location where petitioner resides.
8. Location wherein defendant/respondent functions wholly.
9. Location where one or more of the parties reside.
10. Location of Labor Commissioner Office
11. Mandatory Filing Location (Hub Case)

**Step 4:** Fill in the information requested on page 4 in Item III; complete Item IV. Sign the declaration.

| A Civil Case Cover Sheet Category No. | | B Type of Action (Check only one) | C Applicable Reasons - See Step 3 Above |
|---|---|---|---|
| **Auto Tort** | Auto (22) | ☐ A7100  Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1., 2., 4. |
| | Uninsured Motorist (46) | ☐ A7110  Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist | 1., 2., 4. |
| **Other Personal Injury/ Property Damage/ Wrongful Death Tort** | Asbestos (04) | ☐ A6070  Asbestos Property Damage | 2. |
| | | ☐ A7221  Asbestos - Personal Injury/Wrongful Death | 2. |
| | Product Liability (24) | ☐ A7260  Product Liability (not asbestos or toxic/environmental) | 1., 2., 3., 4., 8. |
| | Medical Malpractice (45) | ☐ A7210  Medical Malpractice - Physicians & Surgeons | 1., 4. |
| | | ☐ A7240  Other Professional Health Care Malpractice | 1., 4. |
| | Other Personal Injury Property Damage Wrongful Death (23) | ☐ A7250  Premises Liability (e.g., slip and fall) | 1., 4. |
| | | ☐ A7230  Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.) | 1., 4. |
| | | ☐ A7270  Intentional Infliction of Emotional Distress | 1., 3. |
| | | ☐ A7220  Other Personal Injury/Property Damage/Wrongful Death | 1., 4. |

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

| SHORT TITLE: Hillair Capital Management LLC, et al. v. Kim Kardashian, et al. | CASE NUMBER |
|---|---|

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable<br>Reasons - See Step 3<br>Above |
|---|---|---|---|
| **Non-Personal Injury/ Property Damage/ Wrongful Death Tort** | Business Tort (07) | ☐ A6029  Other Commercial/Business Tort (not fraud/breach of contract) | 1., 3. |
| | Civil Rights (08) | ☐ A6005  Civil Rights/Discrimination | 1., 2., 3. |
| | Defamation (13) | ☐ A6010  Defamation (slander/libel) | 1., 2., 3. |
| | Fraud (16) | ☐ A6013  Fraud (no contract) | 1., 2., 3. |
| | Professional Negligence (25) | ☐ A6017  Legal Malpractice | 1., 2., 3. |
| | | ☐ A6050  Other Professional Malpractice (not medical or legal) | 1., 2., 3. |
| | Other (35) | ☐ A6025  Other Non-Personal Injury/Property Damage tort | 2.,3. |
| **Employment** | Wrongful Termination (36) | ☐ A6037  Wrongful Termination | 1., 2., 3. |
| | Other Employment (15) | ☐ A6024  Other Employment Complaint Case | 1., 2., 3. |
| | | ☐ A6109  Labor Commissioner Appeals | 10. |
| **Contract** | Breach of Contract/ Warranty (06)<br>(not insurance) | ☐ A6004  Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction) | 2., 5. |
| | | ☐ A6008  Contract/Warranty Breach -Seller Plaintiff (no fraud/negligence) | 2., 5. |
| | | ☐ A6019  Negligent Breach of Contract/Warranty (no fraud) | 1., 2., 5. |
| | | ☐ A6028  Other Breach of Contract/Warranty (not fraud or negligence) | 1., 2., 5. |
| | Collections (09) | ☐ A6002  Collections Case-Seller Plaintiff | 2., 5., 6, 11 |
| | | ☐ A6012  Other Promissory Note/Collections Case | 2., 5, 11 |
| | | ☐ A6034  Collections Case-Purchased Debt (Charged Off Consumer Debt Purchased on or after January 1, 2014) | 5, 6, 11 |
| | Insurance Coverage (18) | ☐ A6015  Insurance Coverage (not complex) | 1., 2., 5., 8. |
| | Other Contract (37) | ☑ A6009  Contractual Fraud | 1., ②③④⑤ |
| | | ☐ A6031  Tortious Interference | 1., 2., 3., 5. |
| | | ☐ A6027  Other Contract Dispute(not breach/insurance/fraud/negligence) | 1., 2., 3., 8. |
| **Real Property** | Eminent Domain/Inverse Condemnation (14) | ☐ A7300  Eminent Domain/Condemnation          Number of parcels_____ | 2. |
| | Wrongful Eviction (33) | ☐ A6023  Wrongful Eviction Case | 2., 6. |
| | Other Real Property (26) | ☐ A6018  Mortgage Foreclosure | 2., 6. |
| | | ☐ A6032  Quiet Title | 2., 6. |
| | | ☐ A6060  Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2., 6. |
| **Unlawful Detainer** | Unlawful Detainer-Commercial (31) | ☐ A6021  Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 2., 6. |
| | Unlawful Detainer-Residential (32) | ☐ A6020  Unlawful Detainer-Residential (not drugs or wrongful eviction) | 2., 6. |
| | Unlawful Detainer-Post-Foreclosure (34) | ☐ A6020F Unlawful Detainer-Post-Foreclosure | 2., 6. |
| | Unlawful Detainer-Drugs (38) | ☐ A6022  Unlawful Detainer-Drugs | 2., 6. |

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

| SHORT TITLE: Hillair Capital Management LLC, et al. v. Kim Kardashian, et al. | CASE NUMBER |
|---|---|

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C Applicable<br>Reasons - See Step 3<br>Above |
|---|---|---|---|
| **Judicial Review** | Asset Forfeiture (05) | ☐ A6108 Asset Forfeiture Case | 2., 6. |
| | Petition re Arbitration (11) | ☐ A6115 Petition to Compel/Confirm/Vacate Arbitration | 2., 5. |
| | Writ of Mandate (02) | ☐ A6151 Writ - Administrative Mandamus | 2., 8. |
| | | ☐ A6152 Writ - Mandamus on Limited Court Case Matter | 2. |
| | | ☐ A6153 Writ - Other Limited Court Case Review | 2. |
| | Other Judicial Review (39) | ☐ A6150 Other Writ /Judicial Review | 2., 8. |
| **Provisionally Complex Litigation** | Antitrust/Trade Regulation (03) | ☐ A6003 Antitrust/Trade Regulation | 1., 2., 8. |
| | Construction Defect (10) | ☐ A6007 Construction Defect | 1., 2., 3. |
| | Claims Involving Mass Tort (40) | ☐ A6006 Claims Involving Mass Tort | 1., 2., 8. |
| | Securities Litigation (28) | ☐ A6035 Securities Litigation Case | 1., 2., 8. |
| | Toxic Tort Environmental (30) | ☐ A6036 Toxic Tort/Environmental | 1., 2., 3., 8. |
| | Insurance Coverage Claims from Complex Case (41) | ☐ A6014 Insurance Coverage/Subrogation (complex case only) | 1., 2., 5., 8. |
| **Enforcement of Judgment** | Enforcement of Judgment (20) | ☐ A6141 Sister State Judgment | 2., 9. |
| | | ☐ A6160 Abstract of Judgment | 2., 6. |
| | | ☐ A6107 Confession of Judgment (non-domestic relations) | 2., 9. |
| | | ☐ A6140 Administrative Agency Award (not unpaid taxes) | 2., 8. |
| | | ☐ A6114 Petition/Certificate for Entry of Judgment on Unpaid Tax | 2., 8. |
| | | ☐ A6112 Other Enforcement of Judgment Case | 2., 8., 9. |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ A6033 Racketeering (RICO) Case | 1., 2., 8. |
| | Other Complaints (Not Specified Above) (42) | ☐ A6030 Declaratory Relief Only | 1., 2., 8. |
| | | ☐ A6040 Injunctive Relief Only (not domestic/harassment) | 2., 8. |
| | | ☐ A6011 Other Commercial Complaint Case (non-tort/non-complex) | 1., 2., 8. |
| | | ☐ A6000 Other Civil Complaint (non-tort/non-complex) | 1., 2., 8. |
| **Miscellaneous Civil Petitions** | Partnership Corporation Governance (21) | ☐ A6113 Partnership and Corporate Governance Case | 2., 8. |
| | Other Petitions (Not Specified Above) (43) | ☐ A6121 Civil Harassment | 2., 3., 9. |
| | | ☐ A6123 Workplace Harassment | 2., 3., 9. |
| | | ☐ A6124 Elder/Dependent Adult Abuse Case | 2., 3., 9. |
| | | ☐ A6190 Election Contest | 2. |
| | | ☐ A6110 Petition for Change of Name | 2., 7. |
| | | ☐ A6170 Petition for Relief from Late Claim Law | 2., 3., 4., 8. |
| | | ☐ A6100 Other Civil Petition | 2., 9. |

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

| SHORT TITLE: Hillair Capital Management LLC, et al. v. Kim Kardashian, et al. | CASE NUMBER |
|---|---|

**Item III.** Statement of Location: Enter the address of the accident, party's residence or place of business, performance, or other circumstance indicated in Item II., **Step 3** on Page 1, as the proper reason for filing in the court location you selected.

| REASON: Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected for this case.<br><br>☐ 1. ☑ 2. ☑ 3. ☐ 4. ☑ 5. ☐ 6. ☐ 7. ☐ 8. ☐ 9. ☐ 10. ☐ 11. | ADDRESS:<br>21731 Ventura Bvd. #300<br>Los Angeles, California 91364 |
|---|---|
| CITY:<br>Los Angeles | STATE:<br>CA | ZIP CODE:<br>91364 |

**Item IV.** *Declaration of Assignment:* I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that the above-entitled matter is properly filed for assignment to the Stanley Mosk _____ courthouse in the Central _____District of the Superior Court of California, County of Los Angeles [Code Civ. Proc., § 392 et seq., and Local Rule 2.3, subd.(a).

Dated: March 21, 2016 _____

_____
(SIGNATURE OF ATTORNEY/FILING PARTY)

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1.  Original Complaint or Petition.

2.  If filing a Complaint, a completed Summons form for issuance by the Clerk.

3.  Civil Case Cover Sheet, Judicial Council form CM-010.

4.  Civil Case Cover Sheet Addendum and Statement of Location form, LACIV 109, LASC Approved 03-04 (Rev. 03/15).

5.  Payment in full of the filing fee, unless fees have been waived.

6.  A signed order appointing the Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court in order to issue a summons.

7.  Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.